## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER and the LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION, | : : : : : | Civil No. 1:19-cv-01307 |
| Plaintiffs, | : : | |
| v. | : : | |
| KEYSTONE PROTEIN COMPANY, | : : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a citizen suit under the Clean Water Act, which is the United States' primary federal law governing water pollution. Before the court are cross motions: Plaintiffs' motion for partial summary judgment, Doc. 32, and Defendant's motion for summary judgment, Doc. 35. For the reasons that follow, Plaintiffs' motion will be granted in part and denied in part, and Defendant's motion will be denied.

### PROCEDURAL HISTORY

Plaintiffs Lower Susquehanna Riverkeeper and the Lower Susquehanna Riverkeeper Association initiated this case by filing a complaint on July 29, 2019 against Defendant Keystone Protein Company ("Keystone"), which owns and operates a poultry rendering facility that generates industrial wastewater. (Doc. 1.) Keystone answered the complaint on August 21, 2019. (Doc. 7.) In the complaint, Plaintiffs allege that Keystone "has discharged and continues to discharge

1

pollutants into waters of the United States in violation of" the Clean Water Act as well as "the conditions and limitations" established by a related permit system. (Doc. 1 ¶ 2.)  Plaintiffs request damages as well as declaratory and injunctive relief.  (*Id.* ¶ 1.)

Keystone filed its first motion for summary judgment on October 25, 2019. (Doc. 15.)  Following a conference call on May 5, 2020, and Keystone's filing of another motion for summary judgment on May 29, 2020, the court denied Keystone's first motion as moot.  (Doc. 38.)  Plaintiffs filed their motion for partial summary judgment on May 29, 2020 as well.  (Doc. 32.)  And, finally on May 29, 2020, the parties filed a First Stipulation of the Parties, which lists a number of stipulated facts that are relevant to this litigation and, more specifically, to the cross motions before the court.  (Doc. 31.)

The parties briefed their respective motions in May, June, and July 2020. (*See* Docs. 32–46.)  Plaintiffs then supplemented the summary judgment record on February 1, 2021.  (Doc. 48.)  Both motions are now ripe for the court's review.

# FACTUAL BACKGROUND[1]

## A. Keystone's Wastewater Treatment and Nitrogen Discharges

On March 30, 2012, the Pennsylvania Department of Environmental Protection ("PADEP") re-issued NPDES Permit No. PA0080829 ("the NPDES permit") to Keystone.  (Doc. 31 ¶ 1.)  The NPDES permit authorized Keystone's "discharge of wastewater in accordance with certain effluent limitations and other requirements."  (Doc. 36 ¶ 5.)  The relevant limitations here are that the NPDES permit limited "Keystone's . . . discharges of total nitrogen from" Keystone's wastewater treatment plant, "Outfall 001," "to 134 mg/l as a monthly average concentration and 194 mg/l as a daily maximum concentration."  (Doc. 31 ¶ 1.) The NPDES permit remains in effect.  (*Id.*)

Keystone admits that it has been in continuous noncompliance with its total nitrogen limits since April 1, 2012, when the NPDES permit took effect.  (Doc. 33 ¶ 1.)  In particular, "Keystone violated its monthly average concentration limit for total nitrogen at Outfall 001 in 66 consecutive months from October 2014 through March 2020."  (Doc. 31 ¶ 12.)  And "Keystone violated its daily maximum concentration limit for total nitrogen at Outfall 001 on 257 days in 66 consecutive months from October 2014 through March 2020."  (Id. ¶ 13.)  Further, in

---

[1] This section provides undisputed factual background regarding the discharge at issue in this case and related facts.  The court discusses additional relevant facts below in its analysis of the jurisdictional and liability issues raised by the parties.

supplementing the record, Plaintiffs have provided evidence of "additional violations" "from April through October 2020" which "bring the total number of days of violating the daily maximum limit to 288 and the total number of months of violating the monthly average limit to 73." (Doc. 48, pp. 1–2.[2])

Keystone discharges from Outfall 001 24 hours a day and seven days a week. (Doc. 33 ¶ 2.) Keystone filed reports covering October 2014 to March 2020 with PADEP. Those reports "show that Keystone discharged wastewater flow from Outfall 001 on every day during those 66 months except for the eighteen days on April 24–26, 2017, December 11–14, 2018, March 12–15, 2019, and January 11–17, 2020. The total number of days with discharges during those 66 months is 2,009 minus 18, or 1,991 days." (Doc. 33 ¶ 3.)

Keystone's wastewater treatment plant was not designed to meet, and therefore could not meet, its permit limits for total nitrogen. (Doc. 33 ¶ 4.) In 2012, Keystone's engineering consultant, Mr. John Reid, designed an upgrade to Keystone's treatment plant so that it could meet its permit limits. (*Id.*) That 2012 upgrade was never built. (*Id.*) In 2019, Keystone began building another upgrade to its treatment plant; this upgrade was scheduled to be finished in August 2020. (*Id.*)[3]

---

[2] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

[3] The parties dispute whether the 2019 upgrade was "similar" to the 2012 upgrade. (*Compare* Doc. 33 ¶ 4 *with* Doc. 44 ¶ 4.)

**B. The Discharge Impairs the Chesapeake Bay**

The United States Environmental Protection Association (hereinafter "the EPA") "has listed the Chesapeake Bay as impaired because of excess nitrogen, phosphorus and sediment."  In 2010, the EPA "issued a Total Maximum Daily Load ("TMDL") under the [Clean Water Act] that established nitrogen, phosphorus, and sediment allocations for the Bay and the watersheds that flow into it, including the Susquehanna River watershed."  (Doc. 31 ¶ 14.)  "Sometime after the Chesapeake Bay TMDL was issued, [PADEP] classified Keystone as a significant discharger of nitrogen to the Chesapeake Bay."  (*Id.* ¶ 15.)  Keystone's wastewater treatment plants ultimately (after different twists, turns, and mergers) discharge nitrogen into the Chesapeake Bay.  (*See id.* ¶ 16.)

Plaintiffs are "non-profit organizations that seek to protect the ecological integrity and water quality of the Lower Susquehanna River, its tributaries, and the Chesapeake Bay."  (*Id.* ¶ 17.)  Plaintiffs' members Ted Evgeniades, Keith Williams and Todd Kennedy "use Swatara Creek, the Susquehanna River, and the Chesapeake Bay for recreational activities."  (*Id.* ¶ 18.)

"The Swatara Creek, Susquehanna River, and Chesapeake Bay are downstream from Keystone's discharges.  Excessive nutrients like total nitrogen can feed the growth of algae and slime in downstream waters and create oxygen-depleted dead zones in the Bay.  All three members complain that they have seen

these conditions and that those conditions have reduced their aesthetic and recreational enjoyment of the Creek, River, and Bay." (*Id.* ¶ 19.)

### C. PADEP and Keystone's Consent Orders

In 2012, PADEP and Keystone entered into an administrative Consent Order and Agreement ("the 2012 consent order"). (Doc. 31 ¶ 4.) Keystone entered into the 2012 consent order "to upgrade its existing rendering plant wastewater treatment plant in order to comply with the total nitrogen limits and other parameters in its [NPDES] permit by October 1, 2016." (Doc. 36 ¶ 7.) The 2012 consent order "imposed stipulated penalties for the discharges that exceed the NPDES permit limits." (Doc. 36 ¶ 8.) Plaintiffs have had actual notice of the 2012 consent order for six years. (Doc. 31 ¶ 5.)

In 2017, PADEP and Keystone entered into a second administrative Consent Order and Agreement ("the 2017 consent order"), which superseded and replaced the 2012 consent order. (*Id.* ¶ 6.) The 2017 consent order "requires complete construction of a new wastewater treatment facility by June 1, 2021 so that Keystone can meet its effluent limitation guidelines, and imposes stipulated penalties for discharges exceeding Keystone's NPDES effluent limits." (Doc. 36 ¶ 12.) Plaintiffs have had actual notice of the 2017 consent order since at least March 4, 2019. (Doc. 31 ¶ 7.)

Both consent orders were negotiated and signed without any prior notice to the Plaintiffs or to the public more generally. Neither the public nor Plaintiffs had an opportunity to comment on or object to the consent orders. (*Id.* ¶ 8.) Plaintiffs have not filed an appeal of either consent order with the Pennsylvania Environmental Hearing Board. (*Id.* ¶ 9; Doc. 36 ¶¶ 10, 14.)

In 2019, Keystone entered into an amendment ("the 2019 amendment") to the 2017 consent order. (Doc. 31 ¶ 10.) The 2019 amendment "required the construction by December 31, 2020 of an interim upgrade to the existing WWTP . . . so that Keystone [could] meet its [total nitrogen] limits while it [was] in the process of constructing [a new wastewater treatment facility]." The 2019 amendment "also requires that by August 21, 2021 Keystone move its discharge from the unnamed tributary of Beach Run to the Little Swatara Creek." (Doc. 36 ¶ 15.)[4]

### JURISDICTION

As a general matter, this court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States.

---

[4] Keystone asserts that the two consent orders "and amendments thereto respectively cover each and every type of discharge at issue in this litigation." (Doc. 36 ¶ 17.) Plaintiffs dispute this. (Doc. 42 ¶ 2.)

In this case, though, the parties raise two jurisdictional issues. First, Plaintiffs ask the court to hold that Plaintiffs have standing to bring their lawsuit. Second, Keystone asks the court to hold that the court is without jurisdiction to decide Plaintiffs' lawsuit. According to Keystone, Plaintiffs' lawsuit is precluded by PADEP's own enforcement action, which has been manifested through the two consent orders.

### A. Standing

The parties assert that they have stipulated to the facts that provide the foundation upon which the court can base a determination that Plaintiffs have standing to bring their lawsuit. (*See, e.g.*, Doc. 34, pp. 7–8.) But as "standing is an Article III requirement for jurisdiction, the parties do not have the power to confer such jurisdiction upon the Court by conceding the standing of certain plaintiffs." *Golden v. Gov't of Virgin Islands, Bureau of Internal Revenue*, 47 F. App'x 620, 622 (3d Cir. 2002) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 234 (2d Cir. 1988)). The court will therefore analyze whether the uncontested jurisdictional facts do, in fact, imbue Plaintiffs with standing.

Plaintiffs bring their lawsuit under Section 505(g) of the Clean Water Act. (*See* Doc. 1 ¶¶ 1, 3.) This provision authorizes a citizen suit by "any person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The Clean Water Act explicitly confers standing to the limits of the

United States Constitution.  *Pub. Interest Research Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 70 n.3 (3d Cir. 1990).  To have standing under the Constitution, a plaintiff must suffer an actual or threatened "injury in fact" that is fairly traceable to the challenged action by the defendant and is likely to be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

The analysis begins with "injury in fact."  "[W]here an environmental plaintiff has demonstrated that his or her use of the affected area has been curtailed or that the aesthetic and recreational value of the area has been or will be lessened, an injury in fact will be found."  *PennEnvironment v. RRI Energy Ne. Mgmt. Co.*, 744 F. Supp. 2d 466, 477 (W.D. Pa. 2010).  Here, the declarations of three of Plaintiffs' members establish that they have suffered an injury in fact.  As outlined in the factual background, the three members have declared that they use Swatara Creek, the Susquehanna River, and the Chesapeake Bay for recreational activities.  They have also declared that that they have seen the byproducts of Keystone's discharges, and that those conditions have reduced their aesthetic and recreational enjoyment of the Creek, River, and Bay.  Under the above analytical framework, these declarations suffice to establish that Plaintiffs have suffered an injury in fact.

Next is traceability.  In this kind of case, traceability "may be established by showing that a defendant has 1) discharged some pollutant in concentrations

greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *Powell Duffryn*, 913 F.2d at 72.  Here, Plaintiffs have shown that Keystone has discharged an excessive level of nitrogen into the Swatara Creek, Susquehanna River, and the Chesapeake Bay.  Plaintiffs have also shown that the excessive nitrogen contributed to their aesthetic and recreational injuries.  Thus, under the above analytical framework, Plaintiffs have shown traceability.

Third is redressability.  Plaintiffs request a court order directing "Keystone to immediately comply with effluent limitations contained in its NPDES permit." (Doc. 1, p. 10.)  Plaintiffs also ask the court to enjoin Keystone from "operating its facilities in such a manner as will result in further violations of its NPDES permit and the" Clean Water Act.  (*Id.* at 9.)  And Plaintiffs request that Keystone be ordered "to pay appropriate civil penalties for each violation of its NPDES permits and the" Clean Water Act."  (*Id.* at 10.)  The court finds that, here, an injunction will redress, at least in part, the harm to the water quality.  *See PennEnvironment*, 744 F. Supp. 2d at 481.  Moreover, the imposition of civil penalties not only is likely to deter Keystone from exceeding its permit levels in the future, but also will serve to deter others as well.  *Id.* at 482.

Finally, the court needs to determine the issue of associational standing. As the United States Supreme Court has stated, "we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The court finds that Plaintiffs meet all three requirements for associational standing. As described above, Plaintiffs have shown that three members of the Lower Susquehanna Riverkeeper Association have standing to sue in their own right. Second, the interests that the Lower Susquehanna Riverkeeper Association seeks to protect are germane to its purpose of "protect[ing] the ecological integrity and water quality of the Lower Susquehanna River, its tributaries, and the Chesapeake Bay." (Doc. 31 ¶ 17.) And third, the Lower Susquehanna Riverkeeper Association brings a citizen lawsuit claim under the Clean Water Act and requests civil penalties as well as declaratory and injunctive relief. As other district courts in Pennsylvania have held, it is appropriate for an association to request these remedies in the context of a Clean Water Act action. *See PennEnvironment*, 744 F. Supp. 2d at 482 (holding that association seeking civil

penalties had satisfied requirements for associational standing); *see also Citizens Coal Council v. Emerald Coal Res., LP*, Civil Action No. 13-003, 2013 U.S. Dist. LEXIS 109481, at *21 (W.D. Pa. June 10, 2013) (same).

As the above analysis shows, each of the plaintiffs in this litigation has standing.  Therefore, the court will grant the part of Plaintiffs' motion for partial summary judgment related to standing.

## B. Preclusion

Section 505(a)(1) of the Clean Water Act authorizes citizen suits against alleged polluters, "except as provided in . . . section 1319(g)(6) of this title." Section 1319(g) falls under the Clean Water Act's "Enforcement" section and is entitled "Administrative penalties."  It authorizes the EPA to "assess administrative penalties against polluters without bringing suit against them."  *PennEnvironment*, 744 F. Supp. 2d at 470.  But it limits that authority – and Plaintiffs' authority to bring a citizen suit – in certain ways.

The relevant limitation here is that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action." 33 U.S.C. § 1319(g)(6)(A).  It follows from this limitation that even when a state agency commences and diligently prosecutes an action, that action does not preclude a citizen suit unless the state law underlying the state action is comparable

to the Clean Water Act.  The United States Supreme Court, in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, has commented that "[t]he bar on citizen suits when government enforcement is under way suggests that the citizen suit is meant to supplement rather than to supplant government action." 484 U.S. 49, 60 (1987).

Keystone contends that, by virtue of the two consent orders, PADEP has "commenced" an action against Keystone and is "diligently prosecuting" that action.  Further, Keystone contends that PADEP is proceeding "under a State law comparable to" the Clean Water Act's relevant subsection.

The court finds that the Pennsylvania legal regime here, the Pennsylvania Clean Streams Law,[5] is not "comparable to" the Clean Water Act's relevant subsection.  Per the court's above analysis of the contours of the Clean Water Act's citizen suit provision, the lack of comparability here provides a sufficient basis to reject Keystone's claim that Plaintiffs' citizen suit is precluded.  As a result, Keystone's motion for summary judgment will be denied.

### 1.  The "Rough Comparability" Standard is Appropriate.

"A comparable state law does not mean that its provisions are identical to the" Clean Water Act.  *L.E.A.D. (Lead Envtl. Awareness Dev. v. Exide Corp.*, No.

---

[5] PADEP cites the Clean Streams Law as authority for the two consent orders.  (*See* Docs. 36-2, 36-3.)

CIV. 96-3030, 1999 WL 124473, at *31 (E.D. Pa. Feb. 19, 1999) (citing *North & South Rivers Watershed Ass'n, Inc. v. Scituate*, 949 F.2d 552, 556 (1st Cir. 1991). There is presently a Circuit split on what finding a federal district court needs to make to determine "comparability." The United States Court of Appeals for the Third Circuit has not articulated which standard the court should employ.

The first standard, "overall comparability," allows more leeway. This standard asks a district court to look at the state law in a holistic manner. Key factors are whether "the state law contains comparable penalty provisions which the state is authorized to enforce, has the same overall enforcement goals as the federal [Clean Water Act], provides interested citizens a meaningful opportunity to participate at significant stages of the decision-making process, and adequately safeguards their legitimate substantive interests." *Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 381 (8th Cir. 1994).

The second standard, "rough comparability," is more restrictive. "Under that approach," a federal court must "focus on the three categories of provisions contained in 33 U.S.C. § 1319(g): penalty assessment, public participation, and judicial review." *Paper, Allied-Indus., Chem. and Energy Workers Int'l Union v. Cont'l Carbon Co.*, 428 F.3d 1285, 1294 (10th Cir. 2005) (citing *McAbee v. City of Fort Payne*, 318 F.3d 1248, 1254 (11th Cir. 2003)). "*Each* category of federal provisions must have a 'roughly comparable' provision under state law in order for

14

the bar against citizen suits to apply." *Id.* (emphasis added). "A court operating under the 'rough comparability' standard engages in an independent analysis for *each* category of state-law provisions; if one is found to be lacking, then the citizen suit cannot be precluded." *Id.* (emphasis added).

For the following reasons, the court finds the "rough comparability" standard more appropriate. "First, requiring compatibility between each class of provisions makes § 1319(g)(6) easier to apply," and prevents this court from having to "weigh incommensurable values." *McAbee*, 318 F.3d at 1255; *see Cont'l Carbon*, 428 F.3d at 1294 (citing *McAbee*, 318 F.3d at 1255). Second, adopting this standard reduces uncertainty for litigants, the legislature, and administrative agencies. *McAbee*, 318 F.3d at 1255; *see Cont'l Carbon*, 428 F.3d at 1294 (citing *McAbee*, 318 F.3d at 1255). And third, this standard is the most logical consequence of the text of § 1319(g)(6), which provides that the state law in question must be "comparable to this subsection" as a whole (which would include all three of the above classes of provisions). *McAbee*, 318 F.3d at 1254; *see Cont'l Carbon*, 428 F.3d at 1294 (citing *McAbee*, 318 F.3d at 1254); *see also Citizens for a Better Env't-California v. Union Oil Co. of California*, 83 F.3d 1111, 1118 (9th Cir. 1996), as amended (July 16, 1996) (endorsing "the plainest reading of the statutory language" and noting that Section 1319(g) "mandates various public notice and comment procedures *as well as* penalty assessment factors") (emphasis

added); *see generally Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co.*, 734 F. Supp. 667, 670 (M.D. Pa. 1989) (holding that citizen suit was not precluded when "no order [was] issued assessing a civil penalty," "no hearing was held subject to the terms of [the relevant Clean Water Act section]," and "no public notice was provided to interested persons").

### 2. The Clean Streams Law Does Not Meet the "Rough Comparability" Standard.

Applying the "rough comparability" standard in this case, the court finds that the Clean Streams Law lacks appropriate measures to provide the public with notice and the opportunity to participate in the decision-making at issue.  This leads to the conclusion that under the "rough comparability" standard, the Clean Streams Law is not comparable to the Clean Water Act.  The court's reasoning is as follows.

Keystone argues that citizens' "right to administratively appeal all [consent orders] and other final actions of the [PADEP] to" the Commonwealth of Pennsylvania's Environmental Hearing Board constitutes enough public participation.  (Doc. 46, p. 13.)  However, "[e]ssentially, the Clean Water Act provides for public participation in three ways: (1) a reasonable notice and opportunity to comment before the issuance of the proposed order assessing a civil penalty; (2) the right to present evidence if a hearing is held; and (3) the right to

petition for a hearing if one is not held." *Paper,* 428 F.3d at 1295 (citing 33 U.S.C. § 1319(g)(4)).

The court acknowledges that the word "comparable" does not indicate that public participation provisions need to be identical between federal and state law. But the Clean Water Act's provisions for notice and comment as well as a hearing before a decision is rendered are distinctly different from the Clean Streams Law's option of an after-the-fact hearing. Though the Clean Streams Law does provide a hearing, it does not provide a notice and comment process to precede and provide context for that potential hearing.

The difference here is especially clear because notice of the decision-making process itself is not provided; rather, only notice of the consent order, after the fact, is provided. The notice-and-comment process is a component that Congress expressly provided for in its construction of this administrative decision-making. To ignore this requirement and focus only on the option of an after-the-fact hearing seems to stretch the meaning of "comparability." For example, in *McAbee v. City of Fort Payne*, the United States Court of Appeals for the Eleventh Circuit, in holding that a state law's public participation provisions were not comparable to the Clean Water Act, held also that "a right to pre-order participation is markedly different from the right to post-decision participation." 318 F.3d at 1256–1257 (11th Cir. 2003); *see also, e.g., Nat. Res. Def. Council, Inc. v. Vygen Corp.*, 803 F.

17

Supp. 97, 101–02 (N.D. Ohio 1992) ("Congress was careful to limit preclusion of citizen enforcement actions only in those situations where the affected public had *ample* opportunity to participate in the process by which the administrative action was taken. . . . Public notice is fundamental to protecting citizen participation in agency decisions. If the public does not know about agency actions, it cannot avail itself of any right to participate in any action that may be taken pursuant to that statute." (emphasis in original); *Pub. Interest Research Grp. of New Jersey, Inc. v. GAF Corp.*, 770 F. Supp. 943, 951 (D.N.J. 1991), *disagreed with on other grounds by Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116 (3d Cir. 2016) (lack of notice was one factor in finding that New Jersey statute was not comparable); *Pub. Interest Research Grp. of New Jersey, Inc. v. New Jersey Expressway Auth.*, 822 F. Supp. 174, 184 (D.N.J. 1992) (lack of notice and comment procedures was one factor in finding that New Jersey statute was not comparable).

The court finds that the Clean Streams Law does not provide the public with adequate notice and the opportunity to participate in PADEP's initial assessment of a civil penalty, which here is expressed through the two consent orders in question. Therefore, on the issue of public participation, the Clean Streams Law is not comparable to the Clean Water Act under the "rough comparability" standard. *See McAbee*, 318 F.3d at 1257; *see also L.E.A.D.*, No. CIV. 96-3030, 1999 WL

124473, at *31 (holding that Clean Streams Law was not comparable because "Plaintiffs lacked any meaningful opportunity to participate in the assessment of civil penalties," while observing that "[n]owhere in the civil penalty scheme of the [Clean Streams Law] . . . does the public have a meaningful opportunity to participate in the civil penalty phase of the administrative enforcement process").[6] The court will therefore deny Keystone's motion for summary judgment on the jurisdictional issue of preclusion.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the

---

[6]  The court disagrees with the reasoning that Keystone's key cases on this issue employ.  First, these cases use the "overall comparability" standard as opposed to the "rough comparability" standard.  Second, most of these cases only require, or focus on, the presence of an after-the-fact hearing in finding comparability on the issue of public participation. *See N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate*, 949 F.2d 552, 556 n.7 (1st Cir. 1991) (explaining that individuals could intervene and file a claim for an individual hearing after the fact); *Arkansas Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 382 (8th Cir. 1994) (likewise focusing on third-party intervention); *Pa. Envtl. Def. Found. v. Borough of N. E.*, Civil Action No. 96-362 Erie, 1997 U.S. Dist. LEXIS 23865, at *29 (W.D. Pa. Dec. 31, 1997) (same).  And, third, the court finds that Keystone's other key case is distinguishable on the facts.  *See Lockett v. E.P.A.*, 319 F.3d 678, 685 (5th Cir. 2003) (detailing state law's provisions for notice and comment).

nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or

suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Having resolved the threshold jurisdictional issues of standing and preclusion, the court will now discuss additional issues on which Plaintiffs have moved for summary judgment.  Plaintiffs request that the court find summary judgment on the issues of: (a) the number of days for which Keystone faces liability for violating its NPDES permit and consequently violating the Clean Water Act (Doc. 34 p. 17); and (b) the maximum civil penalty that Keystone will be obligated to pay for the violations of the daily maximum discharge limit set forth in its NPDES permit (Doc. 45, pp. 8–9.)

The court will defer judgment on the second issue until the penalty phase of this litigation.  The court is choosing to defer for two reasons.  First, it is more efficient for the court to decide all penalty-related issues in the same distinct phase.  For example, in its opposition to Plaintiffs' motion, Keystone raises a number of mitigating arguments concerning the "number of violations for Keystone's monthly average permit limitation exceedances" that the court should impose.  (Doc. 43, pp. 8–9.)  Another court has observed that this determination "is interrelated with the Court's discretionary assessment of appropriate civil penalties."  *Inland Empire Waterkeeper v. Uniweb, Inc.*, No. EDCV07-00480DDP FMOX, 2008 WL 6098645, at *10 (C.D. Cal. Aug. 6, 2008).  The court finds this reasoning persuasive, and the court would prefer to handle all aspects of this "discretionary assessment" at one time, as opposed to piecemeal over multiple rounds of briefing and decisions.

Second, the court notes that Plaintiffs have requested summary judgment on the second issue in their reply brief.  (*See* Doc. 45, pp. 8–9.)  The court will "decline[] to consider [this] argument[] raised for the first time in a Reply brief," as Keystone has not had the opportunity to respond to Plaintiffs' request for summary judgment on this issue.  *Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 67 (E.D. Pa. 2020).  The court notes that both parties will have the opportunity to fully address this issue later during the briefing of the penalty phase.

22

Turning to the first issue – the number of violating days for which Keystone faces liability – the court begins by outlining the guidepost standards established by the Clean Water Act.  Section 505(a)(1) of the Clean Water Act authorizes citizens to bring suit for violation of any "effluent standard or limitation."  33 U.S.C. § 1365(a).  Section 505(f)(6), in turn, defines "effluent standard or limitation" to include "a permit or condition thereof issued under Section 402."  33 U.S.C. § 1365(f)(6).  A federal district court has the power to require compliance with the conditions of such a permit.  33 U.S.C. § 1365(a).  Strict liability applies, as follows: the Clean Water Act "is violated if a permittee discharges pollutants in violation of its permit, regardless of the permittee's *mens rea*."  *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 175 (3d Cir. 2004).

Additionally, permits like the NPDES permit in this litigation provide for two types of effluent limitations and, consequently, two types of violations.  The first effluent limitation sets a limit on the monthly average concentration of a substance.  The second effluent limitation sets a limit on the daily concentration of a substance.  (*See* Doc. 1 ¶¶ 24–25.)  "[D]aily and monthly average limits are designed to avoid distinct environmental harms."  *Allegheny Ludlum*, 366 F.3d at 169.

Here, "Keystone violated its monthly average concentration limit for total nitrogen at Outfall 001 in 66 consecutive months from October 2014 through

March 2020."  (Doc. 31 ¶ 12.)  And "Keystone violated its daily maximum concentration limit for total nitrogen at Outfall 001 on 257 days in 66 consecutive months from October 2014 through March 2020."  (Doc. 31 ¶ 13.)  Further, "Keystone has provided Plaintiffs with evidence that it violated the total nitrogen limits from April through October 2020."  Plaintiffs note that "[t]hose additional violations bring the total number of days of violating the daily maximum limit to 288 and the total number of months of violating the monthly average limit to 73." (Doc. 48, p. 1–2.)

Keystone does not dispute the total number of days in which it violated the daily maximum limit.  *See generally* Doc. 48.  Thus, the court finds that the total number of days in which Keystone has violated its daily maximum limit is 288. And the court will therefore grant the part of Plaintiffs' motion for partial summary judgment concerning Keystone's liability for its daily maximum violations.[7]

The monthly average limit, however, presents different considerations than does the daily maximum limit.  The court will defer determination of the extent of Keystone's violations of the monthly average limit.  In *United States v. Allegheny Ludlum Corp.*, the United States Court of Appeals for the Third Circuit held that "district courts have discretion to determine, on the facts of each case, how many

---

[7] As the court noted above, the court will decline to render a finding at this juncture on the maximum civil penalty that Keystone will be obligated to pay for these violations.

violation days should be assessed for penalty purposes for the violation of a monthly average limit, based on whether violations are already sufficiently sanctioned as violations of a daily maximum limit."  366 F.3d at 169.  This holding compels the court to revisit Keystone's violations of the monthly average limit at the penalty phase of this litigation.[8]  At the penalty phase, the court will have a more fulsome factual record to consider.  *See generally* 33 U.S.C. § 1319(d) (articulating six factors that "the court shall consider" "[i]n determining the amount of a civil penalty"); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990) ("Congress' use of the words 'shall consider' suggests that in arriving at a dollar figure for penalties, the court is to take each listed factor into account as well as any additional factors the court feels have bearing on the question of penalties.").  Accordingly, the court will deny the part of Plaintiffs' motion for partial summary judgment concerning Keystone's liability for its violations of the monthly average limit.  As stated above, the court will be able to resolve this and related issues at the penalty phase of this litigation.

---

[8] The court notes that Plaintiffs agree with this course of action.  (Doc. 45, p. 5.)

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment

will be granted in part and denied in part.  Keystone's motion for summary

judgment will be denied.  An appropriate order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: February 18, 2021